**NATIONAL CASH REGISTER CO. v. REMINGTON ARMS CO., Inc., et al.**

(District Court, D. Delaware. August 28, 1923.)

No. 443.

1. Patents ⬦⟹328—1,161,094, for cash register, claims 21 and 22, held invalid.

The Werner patent, No. 1,161,094, for cash register, and pertaining to the record strip and associated mechanism, claims 21 and 22, *held* too broad, and invalid, in view of the prior art and analogous arts.

2. Patents ⬦⟹328—1,232,705, for cash register, claims 42, 43, and 44, held void for lack of invention.

The Martin patent, No. 1,232,705, claims 42, 43, and 44 for record strip mechanism for cash registers, *held* void for lack of invention, in view of the prior art.

3. Patents ⬦⟹328—1,394,256, for cash register, held not infringed.

The Fuller patent, No. 1,394,256, for cash register, as limited by the prior art, *held* not infringed.

In Equity. Suit by the National Cash Register Company against the Remington Arms Company, Incorporated, and Frederick L. Fuller. Decree for defendants.

Melville Church, of Washington, D. C., Edward H. Green, of New York City, and William G. Mahaffy, of Wilmington, Del., for plaintiff.

Drury W. Cooper and George Ramsey, both of New York City, and William S. Hilles, of Wilmington, Del., for defendant Remington Arms Co., Inc.

MORRIS, District Judge. National Cash Register Company charges, by this suit in equity, Remington Arms Company, Incorporated, with infringement of claims 21 and 22 of patent No. 1,161,094, to Werner, issued November 23, 1915; claims 42, 43, and 44 of patent No. 1,232,705, to Martin, issued July 10, 1917, and claims 87 to 94, inclusive, of patent No. 1,394,256, to Fuller, granted October 18, 1921. Each patent relates to cash registers. Frederick L. Fuller, who was joined as a party defendant, but not served with process, has not appeared. Motion for preliminary injunction was denied. (D. C.) 283 Fed. 196, affirmed (C. C. A.) 286 Fed. 367. The suit is now upon final hearing. The defenses are invalidity and noninfringement.

The claims in suit pertain only to the record strip and its associated mechanism. That strip is old in the art. It is the paper band upon which the facts relating to the transaction put through the machine are permanently recorded. Originally, only the amount of the transaction was so preserved. But a record of facts, other than amount, was desired. Keys for registering such facts were added. Yet the details that might be printed upon the strip were necessarily limited by the number of fact-registering keys. Greater latitude was needed. To meet this need a writing opening was provided in the casing, so that the printed entries on the slip might be supplemented by written memoranda. It was, of course, necessary that the written and printed entries relating to the same transaction be in close juxtaposition upon the strip. This was brought about by having the writing opening and the printing

means placed side by side. The entries were made. Automatic feeding or spacing means then advanced the strip a step to bring an unused portion thereof beneath the writing opening and the printing mechanism to receive the entries of the next transaction. Machines having the printing and writing positions side by side are described in patent No. 375,-087, of December 20, 1887, to Merritt; patent No. 455,111, of June 30, 1891, to Osborne; patent No. 1,080,001, of December 2, 1913 (filed June 6, 1899), to Cleal; and patent No. 1,161,026, of November 23, 1915 (filed December 12, 1910), to Chryst.

In some machines, however, it was found desirable for mechanical and other reasons to place the writing opening in one position and the printing mechanism in another more or less remote from the writing position. Yet the necessity for having in close juxtaposition the printed and written entries relating to the same transaction remained. In some machines such juxtaposition was accomplished by making the printed entry, advancing the strip until the entry so made was adjacent to the writing opening and then making the written entry. In other machines the advance was from writing position to printing position. In both, however, the strip had only a unidirectional movement—from supply roll to storage roll. Hence the spacing between the entries for different transactions was necessarily the distance between the writing opening and the printing mechanism. Paper was thus wasted. Machines having the writing and printing positions separated and a record strip movement in one direction only are described in patent No. 319,092, of June 2, 1885, to Haskell; British patent, No. 21,083 of 1891 to Whitehead; French patent No. 318,571, of 1902, to MacMaster; British patent, No. 9026, of 1910, to Cooper; and British patent No. 452, of 1912, to Japy.

Some machines were so constructed that it was desirable to have the writing and printing positions widely separated. To avoid the gross waste of paper that would result from giving the strip in such machines a unidirectional movement only, the art conceived the idea of imparting to the strip a reciprocating movement, consisting of a backward movement from writing opening to printing mechanism, or vice versa, and a forward movement, greater than the backward movement, so as to leave an unused area of the strip in position to receive the entries for the next transaction. The movement of a point of the paper from one position (writing or printing) to the other position and back came to be known as "shifting," and the excess forward movement as the "feed." Machines in which the strip was given such movements were the subject of many patents, No. 502,226, of 1893, to Dean; No. 603,320, of 1898 to Deubner; No. 674,209, of 1901, to Link; No. 810,376 of 1906 to McCormick and Morrison; No. 1,140,-443, of 1915 (filed April, 1910, and owned by plaintiff), to Chryst; No. 1,161,042, of November 23, 1915 (filed December 13, 1911, and owned by plaintiff), to Fuller; and No. 1,153,360, of September, 1915 (filed September, 1911, and owned by plaintiff), to Von Pein, and others.

Various methods were used to bring about those movements. Dean produced the shifting movement by mounting the entire paper strip

in a sliding drawer provided with a writing opening. When the drawer is in one position—out—the written entry is made. By moving it in, the exposed portion of the strip adjacent to the written entry is brought to the printing position, where the printed entry is automatically made. The outward movement of the drawer brings about the operation of feed rolls to give the strip its forward spacing movement, necessary to prevent the successive entries from being superimposed. Dean's machine is a workman's time recorder, and not a cash register. But with respect to the record strip the arts are, I think, identical. In Deubner, McCormick and Morrison, Chryst (1,140,443), Fuller, and Von Pein the strip is mounted upon and passes over a swinging frame, a portion of which constitutes the writing table. The swinging of the frame on its axis carries the portion of the strip upon which one entry is made into position to receive the remaining entry. That is made, and the reverse movement of the frame bears the strip back to its original position. The positive and distinctive forward feed or spacing movement is brought about during the oscillation of the frame by coacting mechanism. In Link there is no moving drawer, or frame. The writing table is stationary. The axes of the supply and the storage roll are stationary. The backward and forward movements of the strip are accomplished by revolving the supply and the storage rolls first in one direction and then in the other, the forward movement being the greater in order to provide the necessary spacing between entries.

[1] Into the art thus crowded Werner came. His specification says:

"This invention relates to * * * cash registers of the type having provision whereby the record strip may be written upon by the operator at each transaction. * * * More specifically its objects are to provide means whereby in entering a transaction in the machine the record strip may be first written upon then moved to a position in which the printing mechanism of the machine can print adjacent the writing, and after the printing is done moved back to its original position and beyond it one step, thus positioning the record strip for the next entry thereon."

The claims in suit are:

"21. In a machine of the class described, the combination, with printing mechanism, of a frame supporting a record strip, means for moving the record strip independently of the frame to position it to be printed upon by the printing mechanism, and then back to original position, and means for giving it an additional feed in the last-mentioned direction.

"22. In a machine of the class described, the combination, with a printing mechanism, of a frame supporting a record strip, a cover for the record strip having an opening, some distance from the printing mechanism, through which the record strip may be written upon, means for moving the record strip independently of the frame to position that portion adjacent the opening, in position to be printed upon by the printing mechanism, and then return it to original position adjacent the opening, and means for feeding the record strip an additional step in the last mentioned direction."

With respect to what was Werner's contribution to the art the plaintiff says:

"It is, of course, not contended by the plaintiff that the Werner patent in suit discloses for the first time a mechanism for shifting and feeding a detail record strip over a writing table, in a cash register, but, as pointed out by plaintiff's expert, Mr. Browne: 'The Werner patent * * * represents the

first instance in the art of a paper strip which is shifted back and forth with respect to a *relatively stationary frame which carries the writing table* so as to shift the paper between writing and printing positions and to also give a step-by-step advance movement to the paper strip so as to bring the successive portions of blank paper to the writing position.' * * * [Italics plaintiff's.] 'Werner was the first person to make a cash register in which there is a writing opening and a glass plate through which inspection can be made of the record, and in which the paper is shifted between writing and printing positions over a writing table which is carried by a relatively stationary frame, and after the shift the paper is fed one step further forward, so as to bring the written and printed memoranda just made beneath the glass' plate.' "

If I understand plaintiff's position, it is that the pith of Werner's invention lies in the substitution in record strip mechanism of a writing table carried by a relatively stationary frame for a writing table carried by a swinging or oscillating frame, and that, consequently, the operating means called for by the claims in suit are not restricted to the precise means shown in the patent and their equivalents, but cover practically any operating means used in combination with printing means and a relatively stationary frame supporting a writing table. This construction by plaintiff is consistent with the language of the claims in suit. The patent contains 46 claims. Though the patent was applied for December 22, 1911, only one machine has been built in accord with the drawings and specifications. If Werner's real contribution to the art extended only to the particular operating mechanism described in the patent, it will be protected by his specific claims. His general claims, if too broad, need not be narrowed by construction in order to save the fruits of his genius and labor. Hence I am inclined to let the claims in suit stand or fall by the construction placed upon them by the plaintiff.

These claims read literally upon the structure of Link's patent, No. 674,209. He had a stationary writing table, stationary rolls, operating mechanism producing a reciprocating movement of the strip, and a positive feed for spacing the entries pertaining to different transactions. True, Link's structure is a workmen's time recorder, and in the position of rest the entry last made stands immediately beneath the time wheels and is not visible or accessible. These arts are, however, with respect to the matter in hand, analogous, if not identical (Ohmer Fare Register Co. v. Ohmer, 238 Fed. 182, 151 C. C. A. 258), and it is manifest that a transposition of the writing and printing positions would obviate this result, and that the mere reversal of the position of these parts is not invention, particularly as the prior art in many instances showed those parts in reversed position with the printing mechanism in front of or beneath the writing table. A cover for the record strip having an opening some distance from the printing mechanism through which the record strip may be written upon, called for by claim 22, is likewise present in Link. It consists of the cover *21* with the writing opening *22* therein. The mere placing in Link's opening, or the substitution for his opening and shutter, of a glass plate with a writing opening would not constitute invention. Perry v. Co-operative Foundry Co. (C. C.) 12 Fed. 436; Slawson v. Grand Street R. R. Co., 107 U. S. 649, 2 Sup. Ct. 663, 27 L. Ed. 576. Moreover, a glass cover

containing a writing opening, yet protecting from alteration the entries last made while permitting their inspection, was old in the art. It is disclosed in French patent, No. 318,571, of 1902, to MacMaster, British patent, No. 9,026, of 1910, to Cooper, French patent of January, 1911, to Japy and others. I think Werner's contribution resides in his improved operating mechanism only, and that, consequently, his claims in suit are too broad and so invalid.

[2] In the Werner patent the printing was done by a separate hammer operated independently of the writing table. In the Martin patent the separate printing hammer is dispensed with. The record strip is carried against the type carriers for printing by a slight downward swinging movement of the writing table or frame. Claim 42, typical of the three claims in suit, is:

"In a machine of the class described, the combination, with type carriers for making a record on a record strip, of a frame carrying said record material and normally in position for said record material to receive a written record, means for actuating said frame for carrying the record strip against said type carriers to receive a record therefrom, and means for feeding the record strip on said frame in one direction before movement of said frame, so that said record strip is in printing position and for feeding the record strip in a reverse direction and to a greater extent after the printed record is made to present a fresh surface for a written record."

Mr. Browne, plaintiff's expert, says that Martin's advance over Werner consisted in combining "this character of writing table pivoted frame with Werner's paper shift and paper feed." A table of that character is disclosed in Cooper's British patent, No. 9,026, of 1910, and the French and British patents of 1911 and 1912 to Japy. Possibly those patents do not fully anticipate the Martin claims in suit. They are, however, now cited, not as anticipations, but only as affecting the question of presence or absence of invention. Upon this question all elements of the prior art are relevant, and it is unnecessary that every element be found in one embodiment. Ohmer Fare Register Co. v. Ohmer, 238 Fed. 182, 151 C. C. A. 258. I think the substitution of the Cooper or Japy swinging writing table pivoted frame for the stationary writing table and separate printing hammer of Werner required only mechanical skill and did not rise to the dignity of invention. Martin's real contribution—if any he made—to the already crowded art resided in his particular operating mechanism. Assuming that his remaining claims, 84 in number, will give him all the protection to which he is entitled, particularly as no machine has been made in accord with the drawings and specifications of his patent (Elvin Mechanical Stoker Co. v. Locomotive Stoker Co. (C. C. A.) 286 Fed. 309, 311; Henry v. City of Los Angeles, 255 Fed. 769, 780, 167 C. C. A. 113), and giving to the Martin claims in suit the broad construction placed upon them by plaintiff, I find them to be invalid for lack of invention.

[3] The Fuller patent remains. In addition to the patents hereinbefore referred to, the following patents also antedated Fuller: No. 1,165,491, and No. 1,178,376, to Bilyeu and others; No. 1,182,999, to Fuller; No. 1,205,298 and No. 1,302,613, to Werner. In the patent in suit Fuller used means slightly different from any found in the prior

art for shifting the strip. He has the stationary rolls of Link and of the Werner patent in suit. He has the slightly swinging table of Cooper, of Japy, and of Martin. As with them the movement of the table is merely for the purpose of printing and takes no part in the shift or feed. Fuller's shift is brought about by a movable frame carrying only a pair of guides. They form two secondary loops in the main loop of the strip passing over a stationary guide and the writing table located above the movable guides. 'As the frame carrying the guides moves backward, the rear secondary loop is shortened and loosened by the backward movement of the rear guide. The slack in the strip thus brought about is pulled over the writing table by the simultaneous backward movement of the other movable guide, forming the secondary loop under the front of the writing table. This secondary loop is thereby lengthened. The strip is thus shifted from writing to printing position. Printing occurs. The positive feed then takes place. by the revolution of the storage roll, which draws the strip with some effort by a direct pull over the guides and rolls from the supply roll. The return shift is then produced by the reverse movement of the frame carrying the pair of guides.

Defendant's machine performs the function of Fuller's mechanism as did all the machines of the prior art, but by a different mode of operation. In it, as in Deubner, Chryst (1,140,443), Von Pein, Fuller (1,-182,999), and possibly others, the storage and supply rolls are mounted upon a more or less perpendicular movable frame, the axis of the storage roll being coincident with the axis of the frame. The supply roll is located near the lower end of the frame. The record strip passes from the supply roll, under a guide affixed to the movable frame, under another guide affixed to the stationary frame carrying the writing table, over another stationary guide, beneath, around the end and over the top of the writing table, over a guide on the upper end of the movable frame to the storage roll. The forward movement of the frame, pivoted near its center, advances and lowers the upper guide and draws the supply roll backward. This shifts the strip from writing to printing position. Simultaneously and by the same movement the strip is unwrapped from the supply roll and wrapped upon the storage roll. In this movement the storage roll does not rotate with the frame. The reverse movement of the frame causes the supply roll to be advanced. The slack thus supplied in the strip is taken up by the backward and upward movement of the upper guide. The strip is thus shifted from printing position to a position to receive the next written entry. In this movement the supply roll is locked by a ratchet mechanism to the frame, and its backward rotation with the frame causes it to retain that portion of the strip wrapped upon it in the forward movement. The positive feed is thus brought about by a differential movement, as in the swinging frame mechanisms of the art prior to the Fuller patent in suit. The shift involves but a single loop. In it a largely contributing factor is the movable supply roll, likewise shown by the prior art, but which the Fuller patent in suit does not have.

In fact, as I understand defendant's structure, it is not built upon Fuller's patent in suit at all, but is an adaptation of the platen-bearing

pivoted writing table of Cooper and of Japy to the roll-bearing portion of the swinging frames of Deubner and Chryst. The structure of Fuller's patent in suit was not. The disclosures of Fuller's patent, read in the light of his position in the art, do not, I think, entitle him to a construction of his claims broad enough to cover defendant's device. As the defendant does not infringe the Fuller claims in suit, I think it is unnecessary to pass upon the validity of any of those claims.

The law of this case with respect to the question of estoppel raised by the plaintiff is to be found in the opinion of the Circuit Court of Appeals, 286 Fed. 367.

The bill of complaint must be dismissed.